UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

JEANNE LEE WALLNER                                                    PLAINTIFF

v.                                                          NO. 3:11-CV-00359-CRS

J.J.B. HILLIARD, W.L. LYONS, LLC                                     DEFENDANT

## MEMORANDUM OPINION

This case is before the Court on a motion for summary judgment filed by the Defendant,

J.J.B. Hilliard, W.L. Lyons, LLC ("Hilliard"), against the Plaintiff, Jeanne Lee Wallner

("Wallner") (DN 41). For the reasons set forth herein, the Court will grant Hilliard's Motion for

Summary Judgment.

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed. Hilliard is a full-service

brokerage firm that provides wealth management services and financial advice to clients

throughout the country. In August 1982, Hilliard hired Wallner to work as an Options Trader at

its corporate headquarters in Louisville, Kentucky. (Wallner Dep., DN 50-9, at 65:01–04).

Among other things, Wallner's duties as an Options Trader included assisting financial

consultants with options orders and managing client accounts. *Id.* at 101:17–23.

At the time she was hired, the Options Department was supervised by Larry Oxman

("Oxman"). *Id.* at 97:06–08. In 1998, Oxman retired and was replaced by Dennis Moorman

("Moorman"). *Id.* at 97:06–10. As manager, Moorman established procedures for coordinating

vacation and personal time in order to ensure that there would always be at least two employees

in the office. (Moorman Dep., DN 50-7, at 32:19–33:04). Although Moorman believed it was

important to have a fully-staffed office, *see id.* at 26:10–15, he regularly allowed Wallner to take time off. In addition to vacation time, Moorman permitted Wallner to take several weeks of leave when necessary for medical reasons.[1] During this period, Wallner described her relationship with Moorman as "great." *See* (Wallner Dep., DN 50-9, at 69:06–16).

### i. Wallner's Tardiness

At some point between 2003–2007, Wallner began frequently arriving late to work.[2] Although Moorman never documented Wallner's tardiness in his Performance Appraisals, he testified that her tardiness had become a "major problem," (Moorman Dep., DN 50-7, at 57:01–06), about which he had spoken to her on several different occasions, *id.* at 58:14–59:02. According to Moorman, his understanding was that Performance Appraisals were intended to evaluate an employee's "performance on the job," *id.* at 58:01–09, not collateral issues such as tardiness, *id.* at 56:09–16. Thus, rather than report Wallner's tardiness on his Performance Appraisals, Moorman informally warned Moorman that her excessive tardiness was unacceptable. *Id.* at 58:14–20.

Despite Moorman's repeated warnings, Wallner's tardiness continued to be an issue.[3] Eventually, at some point in 2008, Moorman discussed the problem with his superior, Gary

---

[1] In November 2001, Wallner was allowed to take three weeks of leave for hernia surgery. (Wallner Dep., DN 50-9, at 166:3–167:14). In April 2002, Wallner was allowed to take off for four weeks in order to care for her daughter. *Id.* at 168:06–22.

[2] The parties dispute the timing and extent of Wallner's tardiness. Although Wallner admits having arrived after 8:00 AM on certain rare occasions because of traffic or other circumstances beyond her control, (Wallner Dep., DN 50-9, at 146:20–148:07), she denies having been late on any other occasions, *id.* at 149:01–03. However, Moorman testified that Wallner's tardiness was an ongoing problem that he had to deal with "through the years." (Moorman Dep., DN 50-7, at 58:14–59:02).

[3] The parties dispute whether Wallner's tardiness continued to be an issue. Wallner claims that, during the ten-month period following the issuance of the warning, she "heard nothing more about tardiness and heard nothing about unscheduled absences until the day she was terminated." (Response to Mot. for Summ. J., DN 49, at 9). Thus, according to her, "any tardiness that existed must have improved or she would have been terminated earlier." (Response to Mot. for Summ. J. at 9). By Hilliard's account, however, "Wallner… did not take any subsequent steps to improve her ability to come to work on time." (Mot. for Summ. J., DN 41-1, at 8).

England ("England").[4] (England Dep., DN 50-2, at 24:05–21). Moorman told England about Wallner's excessive tardiness and explained that it had created morale problems within the Options Department. *Id.* In response, England instructed Moorman that he should proceed in accordance with Hilliard's disciplinary policy if Wallner's tardiness continued. *Id.* at 24:22–25:05.

### ii. Wallner's Unexcused Absence

In January 2009, Wallner took an unscheduled absence from work. Wallner was scheduled to leave for vacation at 7:00 PM on Thursday, January 8, 2009, but the day before she left, she received an e-mail from American Airlines informing her that her flight had been rescheduled and would now be leaving on Thursday morning at 7:00 AM. (Wallner Dep., DN 50-9, at 173:03–05). Wallner called Moorman Wednesday night and asked if she could skip work on Thursday so that she could catch her flight. *Id.* at 173:12–15. Although Moorman was displeased that Wallner had not requested the day off in advance, he told her to "go ahead" and leave on the rescheduled flight. *Id.* at 173:16–17. With Moorman's permission, Wallner left on the rescheduled flight and consequently did not show up to work on January 8, 2009. *See id.* at 172–174.[5]

When Wallner returned to work after her vacation, Moorman presented her with a formal written warning addressing both her tardiness and her unscheduled absence. *Id.* at 169:24–171:25. Among other things, the warning stated that "[a]ny further unscheduled absences or tardiness will be subject to further disciplinary action up to and including termination." (Wallner

---

[4] England was unsure about the exact date of his conversation with Moorman, but testified that it occurred at least one year prior to Wallner's FMLA leave in October 2009. (England Dep., DN 50-2, at 25:06–14).

[5] Although Moorman gave Wallner his "permission" to leave on the Thursday morning flight, he testified that he still considered her absence unexcused because Hilliard's work day ended at 5 P.M., meaning that her request for time off was treated as having been made on the same day as her absence. *See* (Moorman Dep., DN 50-7, at 151:19–152:02) ("Our day ends at 5. She called me that night. That's next day as far as I'm concerned, which would be same day.).

Dep., DN 41-5, at Exhibit 12). Although Wallner disputed that she had been tardy and believed that her January 8 absence had been excused, (Wallner Dep., DN 50-9, at 172:02–05), she signed the warning in recognition of the fact that she had received it and was aware of the potential consequences of future misconduct, (Wallner Dep., DN 50-10, at 186:02–13).

### iii. Wallner's FMLA Leave

Later that year, on June 5, 2009, Wallner visited a doctor about problems she was experiencing with her right knee. *Id*. at 191:20–192:02. Ultimately, the doctor concluded that Wallner needed a knee replacement, *see id.*, and scheduled her for surgery on August 11, 2009, *id.* at 193:12–14. After her appointment, Wallner told Moorman about her upcoming surgery and informed him that she may need as many as six weeks off work. *Id.* at 193:19–25. Moorman then consulted with England, who told him that Wallner could take up to 12 weeks of leave under the Family Medical Leave Act. (England Dep., DN 50-2, at 41:18–42:03). Moorman relayed this information to Wallner and directed her to consult further with Human Resources Assistant Manager Sharon Landgraf ("Landgraf"). (Wallner Dep., DN 50-10, at 198:07–20). Landgraf provided Wallner with several FMLA forms and notices as well as information concerning Hilliard's short-term disability ("STD") program. (Landgraf Dep., DN 50-5, at 68:05–69:10. Landgraf also informed Wallner that, while Wallner's FMLA leave would be administered by Hilliard's Human Resources Department, the STD program would administered by "The Hartford" ("Hartford"), a third-party business insurance company. *See id.* at 71:06–25.

On July 21, 2009, Wallner returned the FMLA forms accompanied by a statement from her doctor substantiating the medical basis for her leave request. (Wallner Dep., DN 41-5, at Exhibit 16). After receiving these forms, Hilliard approved Wallner's request for FMLA leave beginning on August 11, 2009. *See* (Landgraf Dep., DN 50-5, at 86:25–88:13). Although

Wallner's doctor did not definitively indicate the date on which Wallner would be able to return to work, his report stated that Wallner should not be expected to return for "approximately two months." (Wallner Dep., DN 41-5, at Exhibit 16). According to her own account, Wallner believed that she would not return to work until her doctor had determined that she was medically able to do so. (Wallner Dep., DN 50-10, at 203:07–204:06).

On August 11, 2009, Wallner's doctor operated on her knee and her FMLA leave began as scheduled. *Id.* at 200:20–25. On August 13, 2009, Wallner received a letter from Hartford informing her that it had approved her for its STD program and she would begin receiving benefits on August 18, 2009, and continuing until September 21, 2009. (Wallner Dep., DN 41-5, at Exhibit 18). In addition, the letter advised Wallner that she would have to provide additional medical documentation in order to extend her STD benefits beyond September 21. *Id.*

**iv. Confusion Regarding Wallner's Return-to-Work Date**

During Wallner's FMLA leave, there was confusion regarding when Wallner was planning on returning to work. Because Wallner's STD benefits were scheduled to end on September 21, 2009, Landgraf mistakenly believed that Wallner would be required to return to work on that date. *See id.* at 227:14–229:01. When Landgraf called Wallner to inform her that she would have to return to work on September 21, Wallner became upset and told her that she was not supposed to return to work until her doctor had approved her. *Id.* at 228:14–24. Landgraf insisted that she return to work on September 21, at which point Landgraf claims Wallner began yelling at her and Wallner's husband started screaming obscenities in the background. (Landgraf Dep., DN 50-6, at 204:07–205:10). Ultimately, Wallner was able to contact Hartford and obtain an extension of her STD benefits until October 1, 2009. (Wallner Dep., DN 41-5, at Exhibit 20). When Landgraf learned of Hartford's extension, she sent Wallner a letter and left her a voicemail

informing her of the extension and instructing her to stay in contact with Hilliard about when she intended to return to work. (Landgraf Dep. DN 41-13, at 184:14–185:01, Exhibit 10). However, Wallner did not receive this letter until October 5, 2009, because she and her husband had left the state to visit their daughter in Arizona. (Wallner Dep., DN 50-10, at 266:11–12). Although Wallner claims that she called Langraf four times in an attempt to return her voicemail, *see id.* at 269:15–271:03, Landgraf does not recall ever hearing back from Wallner, (Landgraf Dep., DN 50-5, at 115:20–116:10).

Wallner returned to Louisville on Saturday October 3, and went to see her doctor on Monday October 5. (Wallner Dep., DN 50-10, at 272:02–04). After checking Wallner's knee, the doctor determined that she was able to return to work the following day. *Id.* at 272:05–07. When she left her appointment, Wallner called Moorman and Landgraf to let them know that she would be returning to work the next day. *See id.* at 272:08–11.

### v. Wallner Returns to Work

On Tuesday, October 6, 2009, Wallner returned to work at Hilliard and was reinstated to her position as an Options Trader with the same compensation, benefits, and duties. *Id.* at 272:21–273:16. That afternoon, however, Wallner received a "Final Written Warning" ("Warning") admonishing her lack of communication with Hilliard about her expected return-to-work date as well as her unprofessional conduct during her phone conversation with Landgraf. *Id.* at 273:21–275:02. Like the warning she had received in January, the Warning provided that "Any future violations of Hilliard's policies… will be subject to further disciplinary action up to and including termination." (Wallner Dep., DN 41-5, at Exhibit 23). Although Wallner objected that it was her husband who had acted unprofessionally, she signed the warning in recognition of

the fact that she had received it and that she was aware that future violations could lead to termination. (Wallner Dep., DN 50-10, at 276:18–277:05).

Despite receiving the Warning, Wallner was late to work five out of seven days over the course of the next week. Upset that Wallner was not being a team player, Wallner's co-worker Dunning began recording when Wallner arrived at work each day. (Dunning Dep., DN 41-8, at 5:18–7:04). According to Dunning's records, Wallner arrived at the following times on the following days:

1. October 7, 2009: On Time
2. October 8, 2009: 8:05 AM
3. October 9, 20009: 8:02 AM
4. October 12, 2009: 8:06 AM
5. October 13, 2009: 8:09 AM
6. October 14, 2009: Excused Tardiness Due to Flu Shot
7. October 15, 2009: 8:05 AM

*Id.* at Exhibit 1. After Wallner's second tardy on October 9, 2009, Moorman informed Landgraf that Wallner's tardiness had resumed. (Landgraf Dep., DN 50-6, at 245–47). After Wallner's fifth tardy on October 15, 2009, Moorman told Landgraf that he wanted to terminate Wallner's employment. *See id.*; (Moorman Dep., DN 50-7, at 155–56). Landgraf consulted with Harrison, who in turn spoke with Rogers. (Landgraf Dep., DN 50-6, at 249:01–11). Ultimately, the group agreed to support Moorman's decision to terminate Wallner. *Id.* at 249:07–11.

In the late afternoon of October 15, 2009, Moorman and Landgraf presented Wallner with a document explaining that Hilliard had decided to terminate her. *Id.* at 307:18–309:06. Moorman asked if she had any questions, but Wallner said "You fired me. I have nothing further to say to you…" *Id.* at 308:17–309:01. Landgraf then proceeded to escort Wallner out of the building.

On June 17, 2011, Wallner filed the present action against Hilliard, claiming that Hilliard violated her rights under the FMLA. On November 1, 2012, Hilliard filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56. Having considered the parties' briefs and being otherwise sufficiently advised, the Court will now address Hilliard's Motion for Summary Judgment.

**STANDARD**

Before granting a motion for summary judgment, the Court must find that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of establishing the nonexistence of any issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), a burden which may only be satisfied by "citing to particular parts of materials in the record..." or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). If the moving party satisfies this burden, the burden of production shifts to the non-moving party, who must then identify evidence demonstrating the existence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 322.

In resolving a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the non-

moving party fails to satisfy its burden of counterproduction, the court must grant the motion for summary judgment.

**DISCUSSION**

There are "two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 555 (6th Cir. 2006) (quoting *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004)). Wallner asserts claims based on both an interference and a retaliation theory. In determining whether summary judgment is appropriate, the Court will consider Wallner's claims in turn.

## I. Interference

FMLA interference claims arise under 29 U.S.C. § 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter." To establish a *prima facie* case of interference, the plaintiff must prove that: (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave the employer notice of his intention to take leave; and (5) the defendant denied the employee FMLA benefits to which she was entitled. *Killian*, 454 F.3d at 556 (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)). Because the only issue is whether the employee was entitled to the FMLA benefits denied by his employer, an employer's intent is not relevant to determining whether actionable interference has occurred. *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006). However, the FMLA is not a strict-liability statute, meaning that "employees seeking relief [based on FMLA interference] must… establish that the

employer's violation caused them harm." *Id.* at 508 (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). Furthermore, no interference is actionable provided that "the employer ha[d] a legitimate reason unrelated to the [employee's] exercise of FMLA rights for engaging in the challenged conduct," *id.*, such that the challenged conduct "would have occurred regardless of the employee's request for or taking of FMLA leave." *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003).

The parties do not dispute that Wallner has established the first four elements of her FMLA interference claim. However, Hilliard argues that Wallner has failed to demonstrate that she was denied any FMLA benefits to which she was entitled. According to Wallner, Hilliard denied her FMLA benefits by:

1. Failing to provide her with a "Notice of Eligibility" or "Rights and Responsibilities Notice;"
2. Mistakenly informing her that her return-to-work date was scheduled before her FMLA leave was over;
3. Issuing the Final Written Warning in retaliation for "standing up for her rights under the FMLA;"
4. Discharging Wallner based on her having taken FMLA leave.

(Resp. to Mot. for Summ. J., DN 49, at 44–46).

Although Wallner may be correct that these actions constituted violations of the FMLA, she must also show that they caused her some harm cognizable under the FMLA. 28 U.S.C. § 2617 provides that an employer who violates the FMLA "is liable only for compensation and benefits lost 'by reason of the violation,' § 2617(a)(1)(A)(i)(I), for other monetary losses sustained 'as a direct result of the violation,' § 2617(a)(1)(A)(i)(II), and for 'appropriate' equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B)."

*Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). Because Hilliard permitted Wallner to take the full amount of FMLA leave to which she was legally entitled and thereafter

reinstated her with the same compensation and benefits, the majority of the FMLA violations cited by Wallner did not result in harm cognizable under the FMLA.[6] In fact, the only alleged violation that resulted in such harm was Wallner's termination by Hilliard. Thus, if Wallner hopes to be successful on her FMLA interference claim, she must establish that her termination by Hilliard violated the FMLA.

Wallner's only potential basis for claiming that her termination constituted FMLA interference lies in her assertion that Hilliard terminated her in retaliation for taking FMLA leave. Because FMLA regulations provide that "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions…," 29 C.F.R. § 825.220(c), the Sixth Circuit has concluded that "[i]f an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." *Wysong v. Dow Chemical Co.*, 503 F.3d 441, 447 (6th Cir. 2007). Although the Sixth Circuit has thus held that retaliatory discharge claims are cognizable as FMLA interference claims, it has also recognized that such claims are more appropriately analyzed under the rubric of an FMLA retaliation claim. *See Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282–83 (6th Cir. 2012). In *Seeger*, the Sixth Circuit held that a district court may properly analyze an FMLA interference claim as an FMLA retaliation claim when the plaintiff's only cognizable claim of interference amounts to a claim of retaliatory discharge. *Id.* at 283. Thus, because the plaintiff had "received all of the FMLA leave to which he was entitled" and "was reinstated by [the defendant] to his former position…," the court concluded that "the district court did not err in confining its

---

[6] For instance, Hilliard's failure to provide Wallner with the required notices did not prevent her from taking any leave to which she was entitled nor did it result in a loss or reduction in compensation or other employment-related benefits. Similarly, the fact that there was confusion regarding Wallner's return to work date is immaterial because Wallner was able to take the full amount of leave to which she was legally entitled. Finally, Hilliard's issuance of a final written warning was not accompanied by any formal penalty such as a reduction in pay or other benefits.

analysis of [the plaintiff's] FMLA claim to the retaliation theory." *Id.* Given that Wallner likewise received all of the FMLA leave to which she was entitled and was reinstated by Hilliard to her previous position, her only cognizable claim of interference boils down to a claim of retaliatory discharge. Therefore, the Court concludes that Wallner's FMLA interference claim is more appropriately analyzed as a claim of FMLA retaliation.

## II. Retaliation

FMLA retaliation claims arise under 29 U.S.C. § 2615(a)(2), which provides that "it shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). "The issue in an FMLA retaliation claim is whether an employer retaliated or discriminated against an employee because the employee invoked her FMLA rights." *Chavez v. Dakkota Integrated Sys., LLC*, 832 F.Supp.2d 786, 799 (W.D. Ky. 2011) (quoting *Brady v. Potter*, 476 F.Supp.2d 745, 758 (N.D. Ohio 2007)). Thus, to establish a *prima facie* case of retaliation, Wallner must prove by a preponderance of the evidence that: 1) she engaged in an activity protected by the FMLA; 2) Hilliard knew about the protected activity; 3) Hilliard thereafter took adverse employment action against her; and 4) there was a causal connection between the protected activity and the adverse employment action. *See Morris v. Family Dollar Stores of Ohio, Inc.*, 320 Fed.Appx. 330, 338 (6th Cir. 2009) (quoting *Arban v. West Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003)).

In establishing a causal connection between the protected activity and the adverse employment action, plaintiffs without direct evidence of discriminatory animus have traditionally been required to proceed under the burden-shifting framework established in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[7] However, after the Sixth Circuit

recognized a mixed-motive theory of FMLA retaliation in *Hunter v. Valley View Local Sch.*, 579

F.3d 688 (6th Cir. 2009), plaintiffs asserting mixed-motive claims have instead been governed by

the burden-shifting framework established in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

*See Hunter*, 579 F.3d at 692 n.2. As initially understood by the Sixth Circuit, the *Price

Waterhouse* framework required the plaintiff to produce direct evidence of discrimination, at

which point the burden shifted to the defendant to prove by a preponderance of the evidence that

it would have made the same decision absent the impermissible motive. *See Gagne v.

Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 315–16 (6th Cir. 1989). But after the Supreme

Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), the Sixth Circuit revised its

interpretation of the *Price Waterhouse* framework in light of *Desert Palace*'s holding that the

plaintiff need not produce direct evidence in order to proceed on a mixed-motive theory. *White v.

Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008). Under the burden-shifting

framework established in *White*, a plaintiff may proceed on a mixed-motive claim regardless of

the type of evidence relied upon in establishing the existence of a causal connection. *White*, 533

F.3d at 400. Although it remains unclear whether *White*'s more lenient summary-judgment

standard applies to FMLA retaliation claims, *see Hunter v. Valley View Local Sch.*, 579 F.3d

688, 692 n.2 (6th Cir. 2009), the court's reasoning in *Hunter* suggests that it likely does. In any

event, however, the Court need not decide this issue today because, for reasons discussed below,

Wallner would be unable to survive summary judgment even if *White*'s more plaintiff-friendly

summary-judgment framework were applicable.

---

[7] In cases where the plaintiff produces direct evidence, the plaintiff need not proceed under the *McDonnel Douglas* framework. *See Daughtery v. Sajar Plastics, Inc.*, 544 F.3d 696, 708 (6th Cir. 2008). Instead, upon production of direct evidence, the burden of production immediately shifts to the defendant to prove that it would have made the same decision regardless of the impermissible motive. *Id.* at 709.

Because Wallner has alleged both single-motive and mixed-motive retaliation claims, (Am. Compl., DN 44, at ¶¶ 21–26), the Court will analyze the propriety of summary judgment from the perspective of both a single-motive and a mixed-motive theory. For the reasons set forth below, the Court concludes that summary judgment is appropriate with respect to both Wallner's single-motive and mixed-motive retaliation claims.

**a. Single-motive**

The first issue in analyzing a single-motive claim of retaliation is whether the plaintiff has produced direct evidence of discriminatory animus. "[A] plaintiff may establish discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). If the plaintiff produces direct evidence of discrimination, the burden of production immediately shifts to the defendant to prove that it would have made the same decision regardless of the impermissible motive. *See Daughtery v. Sajar Plastics, Inc.*, 544 F.3d 696, 708–09 (6th Cir. 2008). In the absence of direct evidence of discrimination, the plaintiff must prove the existence of discrimination by "proffer[ing] evidence sufficient to raise the inference that the protected activity was the likely reason for the adverse action." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (quoting *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990). Thus, if Wallner is able to produce direct evidence that Hilliard considered her FMLA leave as a motivating factor in its decision to terminate her, Hilliard will bear the burden of establishing that it would have terminated her regardless of her FMLA leave. Otherwise, Wallner must proceed under the *McDonnel Douglas* burden-shifting framework.

### i. Direct Evidence or Circumstantial Evidence

"Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir. 2005). Evidence "is not considered direct evidence unless a[n improper] motivation is explicitly expressed." *Grubb v. YSK Corp.*, 401 Fed.Appx. 104, 109 (6th Cir. 2010) (internal quotations and citations omitted) (alteration in original). By contrast, "[c]ircumstantial evidence... is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003).

Wallner claims that Moorman's deposition testimony constitutes direct evidence that she was terminated in retaliation for having taken FMLA leave. In his deposition, Moorman was asked about a memorandum he prepared which set forth the reasons that Wallner was terminated.[8] (Moorman Dep., DN 50-7, at 157:10–161:03). The memorandum reads:

> Jeanne Wallner–
>
> It was company policy to be at work at 8:00AM. She was persistently late (5-15 minutes) even in view of repeated warnings. This created a morale problem within the department.
>
> She would occasionally call in the morning before work to inform us that she would be absent from work that day. Unscheduled absences were not permitted.
>
> She failed two (2) Series 4 (Registered option Principal) exams. It wasn't required that she take the exams, I suggested that it would be helpful as a backup in case I was out of the office. It seemed obvious that she made no study effort to pass the exam. It should have been a slam dunk since she had been working in the department for about 20 years.
>
> She had a hip replacement. I believe there was a standard allotment for recuperation of four (4) weeks. However, in case it was required an additional two

---

[8] It should be noted that Moorman prepared this memorandum more than three years after Wallner was terminated. (Moorman Dep., DN 50-7, at 157:15–20).

(2) weeks could be allowed in case it was necessary. There was never any communication from her, to my knowledge, as to when she would return to work.

In a three person department, an absence involved 33% of the work force.

Options trading and surveillance are specialized and critical activities within the daily operations of the departments and can't be adequately replaced by a worker (next door)

An accumulation of deficiencies became intolerable.

(Moorman Dep., DN 41-7, at Exhibit 17). When asked about the memorandum during his deposition, Moorman testified that the reasons stated therein were "basically the reasons" that Wallner was terminated. (Moorman Dep., DN 50-7, at 158:09–18). According to Wallner, because the memorandum references Wallner's surgery and consequent leave of absence, Moorman's testimony that she was terminated for the reasons in the memorandum constitutes direct evidence that Hilliard considered her FMLA leave in deciding to terminate her.

After careful review of Moorman's deposition testimony and the text of the memorandum itself, the Court concludes that Moorman's testimony does not qualify as direct evidence of discrimination. In order for the memorandum to constitute direct evidence, we would have to read its reference to Wallner's surgery as referring exclusively to the fact that Wallner took FMLA leave. On its face, however, the memorandum suggests that Moorman was referring not to Wallner's FMLA leave in and of itself, but instead the fact that "[t]here was never any communication from her… as to when she would return to work."[9] (Moorman Dep., DN 41-7, at Exhibit 17). In arguing against this interpretation, Wallner directs the Court's attention to the two paragraphs immediately following the memorandum's reference to Wallner's surgery. According to Wallner, these paragraphs support her interpretation because they discuss problems

_____

[9] Moorman's deposition testimony itself reveals that Wallner's FMLA leave was not itself the problem. When asked if Wallner's FMLA leave was the problem he intended to identify in the memorandum, he responded that it was actually her lack of communication that he intended to reference. *See* (Moorman Dep., DN 50-7, 177:17–179:02).

experienced by the Options Department as a result of Wallner's FMLA leave, and therefore indicate that she was terminated in retaliation for the trouble that her leave caused Hilliard. Although Wallner's interpretation of these paragraphs might make sense if these three paragraphs were read alone, the totality of the memorandum suggests that these paragraphs refer to problems associated with Wallner's absence from work *in general*, not simply her absence during her FMLA leave. Indeed, the first paragraph of the memorandum references Wallner's tardiness and the second cites Wallner's unscheduled absences from work, thus making it equally likely that the problems cited in the final paragraphs refer not only to those associated with Wallner's FMLA leave, but with her absence from work for any reason, whether due to tardiness, unscheduled leave, medical leave, or otherwise. Thus, while the memorandum clearly suggests that Wallner's FMLA leave was a problem for the Options Department, it falls short of directly proving that her FMLA leave was a motivating factor in Hilliard's decision to terminate her. For these reasons, Moorman's deposition testimony and the accompanying memorandum do not qualify as direct evidence of discrimination.

### ii. *McDonnell Douglas* **Burden-shifting Framework**

Having concluded that Wallner has not produced direct evidence of discrimination, Wallner's single-motive retaliation claim must be analyzed under the *McDonnell Douglas* burden-shifting framework. Under *McDonnell Douglas*, Wallner must first establish the *prima facie* elements of her FMLA retaliation claim, at which point the burden will shift to Hilliard to articulate a legitimate, nondiscriminatory reason for Wallner's termination. *Gates v. U.S. Postal Service*, 502 Fed.Appx. 485, 489 (6th Cir. 2012). If Hilliard articulates such a reason, the burden will then shift back to Wallner to prove by a preponderance of the evidence that Hilliard's proffered reason is pretextual. *Id.*

**A. Wallner's *Prima Facie* Case**

To establish a *prima facie* claim of FMLA retaliation, Wallner must prove by a preponderance of the evidence that: 1) she engaged in an activity protected by the FMLA; 2) Hilliard knew about the protected activity; 3) Hilliard thereafter took adverse employment action against her; and 4) there was a causal connection between the protected activity and the adverse employment action.'" *Morris v. Family Dollar Stores of Ohio, Inc.*, 320 Fed.Appx. 330, 338 (6th Cir. 2009) (quoting *Arban v. West Pub. Corp.*, 345 F.3d 390, 404 (6th Cir. 2003)). The parties do not dispute that Wallner engaged in an activity protected by the FMLA, that Hilliard knew about such activity, and that Hilliard thereafter terminated her. However, Hilliard argues that summary judgment is proper because Wallner has failed to establish a causal connection between her FMLA leave and Hilliard's decision to terminate her.

"[A]t the prima facie stage the burden [of establishing a causal connection] is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence..." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997). "Although no one factor is dispositive in establishing a causal connection, evidence... that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence

of retaliatory conduct to establish causality." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

According to Wallner, the fact that she was terminated only nine days after returning from FMLA leave constitutes temporal proximity sufficient to establish a *prima facie* case of FMLA retaliation. Hilliard counters that this nine-day period is irrelevant because Wallner requested FMLA leave as early as June 5, 2009, over four months before her termination on October 15, 2009. Although some cases appear to analyze temporal proximity by looking to the date on which the employee returns from FMLA leave, *see, e.g.*, *Grose v. Bank One, N.A.*, No. 06-44-JBC, 2008 WL 631174, at *3 (E.D. Ky. Mar. 3, 2008), the better-reasoned approach looks instead to the date on which the employee requests FMLA leave, *see Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001) (analyzing temporal proximity with reference to "the proximity in time between the date [the employee] informed [his employer] of his intention to take a leave of absence and his discharge…"); *Hall v. Ohio Bell Tel. Co.*, No. 12-4032, 2013 WL 2986991, at *7 (6th Cir. June 17, 2013) (stating that "the better measurement of temporal proximity is… the time between [the employee's] first FMLA request and her termination..."). Thus, in deciding whether the temporal proximity between Wallner's FMLA leave and her termination is sufficient to establish Wallner's *prima facie* case, the Court will consider the four-month period between the time she notified Hilliard that she was taking FMLA leave and the time that Hilliard terminated her.

While there is no fixed amount of time necessary for temporal proximity to establish *prima facie* causation, the Sixth Circuit "has typically found the causal connection element satisfied only where the adverse employment action occurred within a matter of months, or less, of the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007). Whereas a

period of three months has been held independently sufficient to establish *prima facie* causation, *see Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004), other cases have held that as many as four or five months of separation vitiates any alleged causal connection, *see Blosser v. AK Steel Corp*., 520 Fed.Appx. 359, 363–64 (6th Cir. 2013) (four months insufficient absent additional evidence); *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (five months insufficient absent additional evidence). Because the four-month period between Wallner's FMLA leave and her termination is not clearly insufficient, the Court will assume without deciding that it suffices to establish Wallner's *prima facie* case of discrimination.

**B. Hilliard's Legitimate, Nondiscriminatory Reason**

The burden of production now shifts to Hilliard to articulate a legitimate, nondiscriminatory reason for Wallner's termination. To do so, Hilliard "need not persuade the court that it was actually motivated by the proffered reasons." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Instead, Hilliard "need only point [to] its own statements in the record articulating the reason… for… termination." *Joostberns v. United Parcel Servs., Inc.*, 166 Fed. Appx. 783, 794 (6th Cir. 2006). Here, Hilliard has identified several nondiscriminatory reasons for Wallner's termination, including her excessive tardiness, unexcused absences, unprofessional decorum, and failure to communicate with Hilliard regarding her expected return-to-work date. (Mot. for Summ. J., DN 41-1, at 6–8, 17–20). Because each of these reasons finds support in the record, Hilliard has clearly satisfied its burden of identifying legitimate, nondiscriminatory reasons for Wallner's termination.

**C. Pretext**

The burden now shifts back to Wallner to prove that Hilliard's proffered nondiscriminatory reasons are pretextual. To establish pretext, Wallner must show that Hilliard's

proffered reasons: 1) have no basis in fact; 2) did not actually motivate her termination; or 3) were insufficient to warrant termination. *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (overruled on other grounds) (citing *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)). In doing so, Wallner "may not rely simply upon h[er] prima facie evidence but must… introduce additional evidence" of retaliation. *Id.*

Wallner does not dispute that Hilliard's proffered reasons have a factual basis,[10] but instead argues that those reasons did not actually motivate Hilliard's decision to terminate her and that, in any event, they were insufficient to warrant her termination. To show that Hilliard was not actually motivated by its proffered reasons, Wallner relies on 1) the temporal proximity between her FMLA leave and her termination; and 2) Moorman's deposition testimony. While temporal proximity may have been sufficient to establish Wallner's *prima facie* case, "temporal proximity alone cannot support a showing of pretext." *Brown v. Humana Ins. Co.*, No. 3:11–CV–227–H, 2013 WL 1831308, at *9 (W.D. Ky. Apr. 30, 2013). Thus, Wallner's only remaining prospect of demonstrating that Hilliard was not actually motivated by its proffered reasons is to identify those portions of Moorman's deposition testimony which she claims establish that Hilliard considered her FMLA leave in making its decision to terminate her.

In attempting to do so, Wallner once again focuses on Moorman's statement that the reasons set forth in the memorandum were "basically the reasons" that Wallner was terminated. According to Wallner, because the memorandum mentioned Wallner's surgery and consequent leave of absence, Moorman's testimony that the reasons set forth therein were "basically the reasons" that Wallner was terminated constitutes strong evidence that she was terminated in retaliation for having taken FMLA leave. However, as discussed above, this testimony fails to

---

[10] Although Wallner disputes *some* of Hilliard's allegations regarding her tardiness in 2007, she never disputes that she was tardy on the five occasions after she returned from FMLA leave.

establish that Wallner was terminated in retaliation for her FMLA leave because 1) the reference to Wallner's FMLA leave refers only to her lack of communication during her FMLA leave, not the mere fact that she took FMLA leave; and 2) the references to the problems caused by Wallner's FMLA leave refer to Wallner's absence from work in general, as opposed to her absence during her FMLA leave. For these same reasons, Moorman's deposition testimony is insufficient to establish that Hilliard's proffered reasons are pretextual.

Wallner next argues that Hilliard's proffered reasons were insufficient to warrant her termination because: 1) she had been tardy numerous times in the past without being terminated; 2) her tardiness had never been documented in Moorman's Performance Appraisals; and 3) her tardiness did not affect the operation of the Options Department. Despite Wallner's insistence to the contrary, these arguments fail to establish that Hilliard's proffered reasons are pretextual. To begin with, Wallner never addresses her unprofessional conduct or unexcused absences, and she has therefore failed to rebut these legitimate reasons for her termination. Furthermore, although Wallner is correct that Hilliard never terminated her for tardiness *in the past*, Wallner has in no way demonstrated that her tardiness was an insufficient reason *at the time of her termination*. Finally, Wallner's conclusory assertion that her tardiness did not affect the operation of the Options Department is belied by Moorman's testimony that he considered her tardiness a "major problem," (Moorman Dep., DN 50-7 at 57:01–06), and also by Dunning's testimony that Wallner's tardiness "made things difficult," (Dunning Dep., DN 50-8, at 28:13–23).

In sum, Wallner has fallen well short of establishing that Hilliard's proffered reasons for terminating her are pretextual. For this reason, the Court concludes that there is no genuine dispute of material fact with respect to Wallner's single-motive FMLA retaliation claim and will therefore grant Hilliard's Motion for Summary Judgment with respect to this claim.

**b. Mixed-motive**

Wallner also asserts a mixed-motive claim of retaliation, which is not analyzed under the *McDonnel Douglas* burden-shifting framework. Although it remains unclear exactly which framework applies to mixed-motive retaliation claims, the Court will assume without deciding that *White* is applicable. For the reasons set forth below, Wallner's retaliation claim cannot survive summary judgment even under the most plaintiff-friendly burden-shifting framework established in *White*.

Under *White*, Wallner must prove by either direct or circumstantial evidence that her FMLA leave was a motivating factor in Hilliard's decision to terminate her. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 401 (6th Cir. 2008). If she is able to do so, a genuine issue of material fact exists with respect to her mixed-motive retaliation claim and the motion for summary judgment must be denied.

As discussed above, Wallner has not produced direct evidence that Hilliard considered her FMLA leave as part of its decision to terminate her. Accordingly, Wallner must rely solely on circumstantial evidence in establishing that her mixed-motive retaliation claim presents a genuine issue of material fact. In addition to temporal proximity and Moorman's deposition testimony regarding the memorandum, Wallner argues that the following evidence demonstrates that her FMLA leave was a motivating factor in Hilliard's decision to terminate her: 1) her termination was based partly on the Warning she received after returning from FMLA leave; and 2) the fact that Landgraf misinformed Moorman of Wallner's return-to-work date and thereby "tainted the Options department against [her] by having them believe [she] was returning to work when she was not." (Resp. to Mot. for Summ. J., DN 49, at 59).

Although the temporal proximity between Wallner's FMLA leave and her termination may raise suspicion that her termination was based on a discriminatory motive, it alone is not enough for her mixed-motive retaliation claim to survive summary judgment. Because "temporal proximity alone cannot support a showing of pretext" under the *McDonnel Douglas* burden-shifting framework, *Brown v. Humana Ins. Co.*, No. 3:11–CV–227–H, 2013 WL 1831308, at *9 (W.D. Ky. Apr. 30, 2013), it stands to reason that temporal proximity alone cannot establish a *prima facie* case of mixed-motive retaliation under *White*. Thus, while temporal proximity was sufficient to establish Wallner's *prima facie* case with respect to her single-motive retaliation claim, she must produce other evidence in order to survive summary judgment on her mixed-motive retaliation claim.

The other evidence cited by Wallner fails to create a genuine issue of fact regarding whether a causal connection existed between Wallner's FMLA leave and her termination. First, for reasons already discussed, the Court does not agree with Wallner's reading of Moorman's deposition testimony, and therefore does not credit his testimony as evidence that Hilliard considered Wallner's FMLA leave in making its decision to terminate her. Second, the mere fact that Wallner's termination was based partly on the Warning she received for unprofessional conduct during her FMLA leave does not in any way suggest that she was terminated in retaliation for having taken FMLA leave. Although her FMLA leave was indeed a but-for cause of her receiving the Warning and consequently her termination, the FMLA only prohibits *proximate* causation between FMLA leave and termination.[11] *See Schaaf v. Smithkline Corp.*,

---

[11] In relying on the distinction between but-for causation and proximate causation, the Court agrees with the Eleventh Circuit that

> Th[e] distinction between but-for and proximate causation makes good sense in the FMLA context. Holding that but-for causation is somehow sufficient to support an FMLA claim… would effectively protect deficient employees from adverse employment actions… These employees could take leave and actually hope their employers uncover evidence of their transgressions while they are away. If such

602 F.3d 1236, 1241–43 (11th Cir. 2010); *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 806

(7th Cir. 2001). In other words, simply because Wallner happened to misbehave while on FMLA

leave does not entitle her to immunity from termination based on such misbehavior. *See Kohls*,

259 F.3d at 806 ("The fact that the leave permitted the employer to discover the problems can

not logically be a bar to the employer's ability to fire the deficient employee."). Finally, Wallner

has failed to provide a concrete explanation of how the "taint" caused by Landgraf's mistake

regarding her return-to-work date factored into Hilliard's decision to terminate her. Although

Wallner claims that the resulting confusion "created suspicion in the eyes of Moorman," (Resp.

to Mot. for Summ. J., DN 49, at 59), the deposition testimony she cites to support this claim fails

to demonstrate the existence of any suspicion on the part of Moorman, much less that such

suspicion played a role in Moorman's decision to terminate her, *see id.* (citing Moorman Dep.,

DN 50-7, at 107:14–108:18).

 For these reasons, Wallner has failed to establish that Hilliard considered her FMLA

leave in making its decision to terminate her. Thus, the Court concludes that there is no genuine

issue of material fact with respect to her mixed-motive claim of FMLA retaliation and will

therefore grant Hilliard's Motion for Summary Judgment with respect to this claim.

 A separate order will be entered in accordance with this opinion.

**Charles R. Simpson III, Senior Judge**
**United States District Court**

November 4, 2013

---

evidence were revealed, the statute would prevent their employer from ever taking adverse action against
them, as the leave would always be the but-for cause of the discovery of that evidence. Such a laughable
result is not supported by policy, by common sense, or, most importantly, by the statute itself.

*Schaaf v. Smithkline Corp.*, 602 F.3d 1236, 1242–43 (11th Cir. 2010).