UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


JEANNE LEE WALLNER,                                              PLAINTIFF


v.                                          CIVIL ACTION NO. 3:11-CV-359-CRS


J.J.B. HILLIARD, W.L. LYONS LLC,                               DEFENDANT
d/b/a Hilliard Lyons Asset Management


**MEMORANDUM OPINION**


This matter is before the Court on motion of Defendant, J.J.B. Hilliard, W.L. Lyons, LLC

("Hilliard Lyons"), for partial summary judgment on the basis that Plaintiff Jeanne Wallner

("Wallner") "seeks relief unavailable as a matter of law." DN 71.  Plaintiff Wallner subsequently

filed a motion for leave to file sur-reply to Defendant's reply to Plaintiff's response to

Defendant's motion for partial summary judgment. DN 74.  Fully briefed, these matters are now

ripe for adjudication.   Having considered the parties' respective positions, we conclude that,

while most of Hilliard Lyons' arguments present genuine issues of material fact or are incorrect

as a matter of law, her lost 401(k) returns must be limited to the rates-of-return reflected in

Hilliard Lyons' Profit-Sharing Plan and that she is not entitled to present evidence of her lost

bonuses as a matter of law.   For the reasons set forth below, we will grant the Defendant's

motion for partial summary judgment on these limited issues and deny the rest.  As such, the

Court will also deny Wallner's motion for leave to file a sur-reply as moot because it seeks to

address issues decided in Wallner's favor.

**I.**

On November 5, 2013, the Court granted Hilliard Lyons' motion for summary judgment on Wallner's claims for Family and Medical Leave Act ("FMLA") interference and retaliation, the only claims against Hilliard Lyons in Wallner's Amended Complaint. DN 59.[1]  Wallner then appealed to the Sixth Circuit.  On appeal, the Sixth Circuit affirmed our entry of summary judgment in Hilliard Lyons' favor on the FMLA interference claim, but reversed our entry of judgment against Wallner's FMLA retaliation claim. DN 64.  The Court of Appeals remanded for further proceedings as a result. *Id.*

Now on remand, the matter has been set for trial.  Hilliard Lyons presently moves the Court for partial summary judgment, "not [on the] substantive merits of Wallner's retaliatory termination claim," but on the "narrow" issue of "potential damages available to Wallner as a matter of law." DN 71-1, p 1.  The parties have limited their arguments to this issue, and we address them below.

**II.**

A court may grant a motion for summary judgment if it finds that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the nonmoving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[1] The factual background of this matter is laid out in DN 58.

247–48 (1986).

The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962). However, the nonmoving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party cannot rely upon the assertions in its pleadings; rather that party must come forward with probative evidence, such as sworn affidavits, to support its claims. *Celotex*, 477 U.S. at 324. It must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.

### III.

We now turn the substance of Hilliard Lyons' motion for partial summary judgment. Its arguments are best understood when viewed in light of the relief sought in its motion. Should the Court grant Hilliard Lyons' motion, Hilliard Lyons requests that we issue an order establishing:

> 1). that Wallner is precluded from seeking damages against Hilliard Lyons for any period beyond the time frame of October 15, 2009, through September 30, 2011; 2). that any damages must necessarily be limited to actual wage and benefits losses during that period; and, 3) that Hilliard Lyons is entitled to offset any damages by the total amount of unemployment insurance benefits and Social Security benefits Wallner received between October 15, 2009, and September 30, 2011.

DN 71. As grounds for each request, Hilliard Lyons contends, respectively, that Wallner failed

to mitigate her damages after September 30, 2011, Wallner has presented insufficient evidence of her actual wage and benefit losses, and Wallner's unemployment insurance and Social Security benefits are not collateral source payments. DN 71-1. Wallner opposes each contention.

### A. Failure to Mitigate

In the first section of its Motion, Hilliard Lyons argues that Wallner is precluded from seeking damages for any time beyond the period of October 15, 2009 to September 30, 2011. This represents the period from which Hilliard Lyons terminated Wallner to when Wallner allegedly ceased searching for alternative employment. In other words, Hilliard Lyons argues that Wallner ceased to mitigate her losses as of September 30, 2011, thus limiting Hilliard Lyons' liability for any damages occuring thereafter. We find, however, that whether Wallner met her duty to mitigate is a question involving genuine issues of material fact for reasons that follow.

Once a wrongfully-terminated employee establishes a prima facie case and presents evidence on the issue of damages, the defendant employer may argue that the employee failed to mitigate his or her damages by seeking alternative employment. *See Taylor v. Invacare Corp.*, 64 F. App'x 516, 523 (6th Cir. 2003) (citations omitted)(FMLA). However, the defendant employer bears the burden of the establishing a plaintiff's lack of diligence in mitigation. *Id*. A defendant satisfies this burden *only by establishing*: 1). that there were substantially equivalent positions available; and, 2). that the plaintiff did not use reasonable care and diligence in seeking such positions. *Id*. On the second prong, the plaintiff "is only required to make reasonable efforts to mitigate damages, and is not held to the highest standards of diligence." *Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549, 557 (6th Cir. 2006). The reasonableness of his or her effort, moreover, "should be evaluated in light of the individual characteristics of the

claimant and the job market." *Id.* (citing *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 623 (6th Cir.1983)).

Here, Hilliard Lyons has not even asserted that there were substantially equivalent positions available to Wallner on or after September 30, 2011. In fact, Hilliard Lyons has only come forth with two record-based arguments in furtherance of its mitigation defense; yet, neither touches on the positions-available prong of its defense or presents compelling evidence of the second prong. First, it points to the following testimony from Wallner:

> Q. Okay. When did – have you stopped looking for jobs?
>
> A. I stopped looking last September. I had exhausted every financial job that I could find, and my license had expired, and I just wanted a job back like I had before in the same business.
>
> Q. Did you search for any other kinds of jobs?
>
> A. After that, no.

DN 71-2, p. 49. But this testimony is not as damaging as Hilliard Lyons would have the Court believe and actually cuts against Hilliard Lyons' argument in some respects. On one hand, this is the only record evidence relevant to the availability of "substantially equivalent positions available" – quite plainly, Wallner's statement that she "exhausted every financial job that [she] could find" points to a lack of substantially equivalent jobs. Again, Hilliard Lyons has not argued the contrary. On the other, that Wallner "stopped looking [in] September" does not mean that she failed to "exercise reasonable care and diligence." In fact, the record evidence shows that Wallner was nearly 65 as of September, 2011, and that her Financial Industry Regulation Authority licenses, which need to be in use with an employer to stay current, had expired. Hilliard Lyons has not disputed that Wallner needed such licenses to obtain substantially equivalent employment.

Second, Hilliard Lyons highlights the fact that Wallner's eligibility for unemployment insurance benefits expired on or around September 30, thus ending her statutory obligation to seek new employment as a predicate for receiving unemployment benefits.  But this fact is circumstantial evidence of her efforts, at best, and will not carry the day in light of other evidence indicating that she "exhausted every financial job."  Construing the evidence in a light most favorable the Plaintiff, we are faced with a harsh reality: that "substantially equivalent positions" may not have been available to a sixty-five (65) year old who, regardless of her efforts, was one year away from retirement and whose relevant licenses had expired through no fault of her own.  This is reinforced by the rule explaining that Wallner's burden to mitigate damages "[wa]s not onerous and d[id] not require success," *Brooks v. Woodline Motor Freight, Inc.,* 852 F.2d 1061, 1065 (8th Cir.1988) – reflecting a principle that, in light of Wallner's circumstances, could ultimately be fatal the Hilliard Lyons' mitigation defense on its own. Finding genuine issues of fact regarding Wallner's alleged failure to mitigate, we will deny Hilliard Lyon's motion on that issue.

## B.  Salary and Benefits

Under the FMLA, an employee affected by his or her employer's violation of the Act may recover damages equal to "wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation." 29 U.S.C.A. § 2617(1)(A)(i)(I). For this reason, Wallner's Rule 26 Supplemental Disclosure claimed $400,807 in total damages under this provision, comprised of the following: lost salary and bonuses, diminution in her Social Security benefits "due to *forced* early retirement," lost 401(k) contributions, and lost 401(k) returns. DN 41-17.  Hilliard Lyons disputes each of Wallner's relevant allegations and calculations.

### 1. Salary and Bonuses

First, Hilliard Lyons disputes the amount of lost compensation that Wallner claimed in her Rule 26 Supplemental Initial Disclosure.  Specifically, Hilliard Lyons argues that Wallner's purported lost salaries of $54,446 in 2010, $56,079 in 2011, and $57,761 in 2012 are unfounded, and that the trier of fact should use a base salary of $43,524, taken from Wallner's 2009 W-2, to calculate her losses for those years.  Notwithstanding these arguments, we believe that Hilliard Lyons raises fact-specific disputes that are best left to a factfinder.  Once a plaintiff in Wallner's position has shown the existence of damages with *reasonable certainty*, "the precise amount is necessarily left to the discretion of the finder of fact, to be exercised reasonably and within the range of the proofs" presented.  *Hill v. Spiegel, Inc.*, 708 F.2d 233, 238 (6th Cir. 1983) (citing *Drayton v. Jiffee Chemical Corp.*, 591 F.2d 352, 366 (6th Cir.1978)).  As the following will show, Wallner has cleared this hurdle.

The parties' salary-and-bonus dispute begins with a foundational question: based on what figure should these losses be calculated?  Wallner's proffered figures – losses extrapolated from her total pay of $54,446 in 2008 – are based on her *2008 gross pay*, not her 2008 salary. Notably, however, her 2008 gross pay included two discretionary bonuses – and she alleges that that she and similarly-situated employees received a bonus each year. DN 72.  Hilliard Lyons' disputes the use of these figures.  It argues that, instead of using Wallner's 2008 gross pay, a jury should use Wallner's 2009 gross pay of $43,524 to calculate her relevant losses.  Construing the facts in a light most favorable the Wallner, however, her 2009 gross pay does not include any bonuses, and Hilliard Lyons did not provide her a bonus in 2009 *only because* it discharged her before the year ended. *Id*.  Were that the case, Wallner's 2009 gross pay would not be an

accurate reflection of what her gross pay would have been in 2010, 2011, or 2012.  Her 2008 gross pay, in such a case, would.

Yet, Hilliard Lyons argues that Wallner has not come forth with enough evidence of lost bonuses – discretionary bonuses that she admits were given based on company performance and at the will of her supervisor – to have the issue presented to a jury.  In light of Wallner's inadequate proof, it contends, whether she would have received a bonus from 2010 to 2012 is too speculative to be presented to a jury.  And if Wallner may not present evidence of bonuses, Hilliard Lyons concludes, her 2009 gross pay – which, again, did not include a bonus – would be the best reflection of what her 2010, 2011, and 2012 gross pay would have been.  The Court agrees.

To meet her burden of establishing that she would have received discretionary bonuses from 2010 to 2012 with "reasonable certainty," Wallner has put forth the following evidence: that a portion of her 2008 gross pay was attributable to bonuses; the amount of her 2008 bonuses; that she received bonuses as part of her yearly gross pay from 2005 through 2008; that Hilliard Lyons gave bonuses to Wallner and a similarly-situated employee every year; and, testimony from Cassondra Dunning, a Hilliard Lyons employee, that she received a bonus from 2009 to 2012. DN 72, p. 6.  But a factfinder cannot conclude from this evidence that Wallner would have received a bonus in each year from 2010 to 2012 without resorting to "mere speculation, guess, or conjecture" – especially where she has only shown that a lone Hilliard Lyons employee received a bonus in those years.  Establishing that Hilliard Lyons provided discretionary bonuses to Cassondra Dunning over this period is vastly different from establishing that it provided bonuses to most or all of its employees, let alone that Wallner would have been one of those employees.  We conclude that Wallner has not shown "with reasonable certainty" that she

suffered damages in the form of lost discretionary bonuses.  Consequently, the Court will not permit Wallner to present her evidence of lost bonuses at trial.

Finally, the parties dispute whether Wallner's salary would have increased at a rate of 1.5% or 3% over the three-year period in question, and both parties have presented evidence to support their position.  However, Wallner's W-2s from the four (4) years leading up to her termination are a part of the record.  A trier of fact is capable of calculating her lost wages from these figures and other record evidence.  Moreover, any evidence indicating that either party's figures are anomalous can be presented at trial.  This, like the parties' base-salary dispute, presents an issue of fact that the Court will leave to the factfinder.  As a result, we will grant Hilliard Lyons' motion insofar as it challenges Wallner's evidence of lost bonuses and deny it with respect to lost salary.

### 2.  Benefits

It is undisputed that, had Wallner remained employed by Hilliard Lyons until the age of sixty-six (66) – her "retirement age" under 29 C.F.R. § 404.409(a) (2009) – she would have become entitled to 100% of her Social Security benefits instead of the 80% she currently receives.  It is also undisputed that Hilliard Lyons would have continued contributing to her 401(k) plan to some extent, and that Wallner would have realized gains on her 401(k) during that period.  As such, Wallner argues that, if she prevails at trial on her FMLA retaliation claim, she will be entitled to the losses she incurred and will incur in these three arenas as a result of Hilliard Lyons FMLA violation.  Hilliard Lyons contests Wallner's proof of these alleged losses.  As gatekeeper, the Court must accordingly determine whether Wallner has come forth with sufficient evidence for these issues to be submitted to a jury.

### a. Social Security

Hilliard Lyons admits that Wallner may recoup $271[2] per month in Social Security benefits – representing the diminution of her Social Security payments from 100% to 80% – for a period of 22 months, from the date she was terminated to the date she allegedly failed to mitigate. As noted above, however, genuine issues exist on the mitigation argument. Thus, if the trier of fact determines that Wallner did, in fact, meet her duty to mitigate, there is no dispute that Wallner is entitled to $271 per month in Social-Security-benefit losses during the period of October 15, 2009 to the date of her expected retirement. In either case, the sum of these losses would become a part of Wallner's back pay award, *Roush v. KFC Nat. Mgmt. Co.*, 10 F.3d 392, 400 (6th Cir. 1993), and we will permit Wallner to address it at trial.

A peculiar issue arises, however, in deciding how to characterize the remaining portion of Wallner's Social Security losses: the $271-per-month diminution of her benefit payments *beyond her anticipated retirement*, which are *future* losses. Wallner argues that this amount should be included in her back pay award, but Hilliard Lyons disagrees, arguing instead that such an award would be appropriately characterized as front pay because it represents lost future payments. The parties' dispute is of importance because a front pay award must be supported by "essential data necessary to calculate a reasonably certain . . . award." *Arban v. West Pub. Corp.*, 345 F.3d 390, 406 (6th Cir. 2003).

---

[2] This number represents the monthly difference between the Social Security benefit Wallner received as a result of drawing her benefits at age sixty-three (63) ($1,084, representing 80% of her potential benefits) and the benefit she would have received had she not drawn her benefits until age sixty-six (66) ($1,355). Wallner alleges that she had no choice but to begin drawing on her Social Security benefits at sixty-three (63) because Hilliard Lyons discharged her and she was unable to find alternative employment.

Unfortunately, no court within the Sixth Circuit has addressed how we should treat a future stream of Social Security payments. And on the broader issue of "loss of a future stream of payments," we cannot find a single instance in which a court within this Circuit has characterized such a loss as back pay. Yet, the Sixth Circuit *has addressed* whether lost future pension payments are a part of back pay or front pay, and we look to its discussion for guidance.

In *Skalka v. Fernald Environmental Restoration Management Corp.*, an age-discrimination case, the plaintiff was unlawfully terminated and resultantly lost post-retirement "pension benefits he eventually would have received if he had stayed at [the defendant-employer] until retirement." 178 F.3d 414, 425 (6th Cir. 1999). At the district-court level, the jury was instructed that "back pay" included "pension benefits which a plaintiff would have received had the discrimination not occurred." *Id*. On appeal, however, the Sixth Circuit took issue with this instruction and endorsed the defendant's position that "by definition, payments expected in the *future* cannot be part of *back* pay." *Id*. (emphasis in original). Consequently, it reversed the district court and held that the plaintiff's "expected pension . . . should [have] be[en] treated as front pay." *Id*. Here, similar to *Skalka*, Wallner would have received full Social Security payments had she stayed at Hilliard Lyons and not drawn on her Social Security until retirement at sixty-six (66). Moreover, she is seeking losses on payments that are not yet due but that she expects *in the future*. We see no reason to treat Social Security and pension payments differently in this context and will treat her $271 per-month future losses on these payments as front pay.

But has Wallner put forth the essential data necessary to calculate her lost future Social Security benefits? The Sixth Circuit has explained: "While the determination of the precise amount of an award of front pay is a jury question, the initial determination of the propriety of an

award of front pay is a matter for the court." *Arban v. West Pub. Corp.*, 345 F.3d 390, 406 (6th Cir. 2003).   In that regard, a plaintiff seeking "front pay [under the FMLA] must provide the district court with the essential data necessary to calculate a reasonably certain front pay award." *Id*.  Such evidence may not be purely speculative; for example, a plaintiff may not guess, without evidence, as to what he or she would have made in *future* lost wages. *See id*. at 407.  We have also been instructed to consider the following in determining whether an award of front pay is even appropriate:   "an employee's duty to mitigate, 'the availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy, the discount tables to determine the present value of future damages and other factors that are pertinent on prospective damage awards.'" *Id*. at 406 (citing *Roush*, 10 F.3d at 399).  Most of these factors, however, are intended to aid a factfinder in determining a plaintiff's future *lost wages* as they would have accumulated in the absence of discrimination and until the employment relationship lawfully terminated – through retirement or otherwise. *See id*.; *see also Shore v. Fed. Exp. Corp.*, 777 F.2d 1155, 1160 (6th Cir. 1985) (explaining that the factors aid courts in determining whether there is a basis for calculating future earnings).

But here, Wallner, now nearly seventy (70) years old, *has already reached retirement* and is seeking prospective Social Security benefits that she will lose as a result of the alleged wrongful termination, not prospective lost wages.  Therefore, our consideration of Wallner's duty to mitigate, the availability of employment opportunities, the period within which she may by reasonable efforts may be re-employed, and her work expectancy is only relevant as a way of determining whether she drew on her Social Security at sixty-three (63) due to "forced early retirement" or Wallner's failure to mitigate.  In other words, we need to consider whether the

diminution of Wallner's Social Security was self-inflicted by Wallner or occurred as a result of Hilliard Lyons' actions.  But because this question mirrors the duty-to-mitigate issue addressed above, our finding that there exist genuine issues of material fact as to mitigation applies with equal force here.

This leaves the Court with the remaining considerations relevant to Wallner's front-pay award: by how much her Social Security payments were diminished as a result of the unlawful termination, her life expectancy, and the discount tables.  Because Wallner has presented sufficient evidence on diminution and life expectancy, we will allow her to present the issue to a jury.  First, the parties do not dispute that, because Wallner drew on her Social Security benefits at the age of sixty-three (63), her future payments will be diminished by $271 per-month. DN 73, p. 8.  But less certain is Wallner's life expectancy.  She contends that per the Social Security Administration's "Life Expectancy Calculator," which assists in retirement planning by considering sex and birthdate only, her life expectancy is 87.1 years. DN 72, p. 9.  Hilliard Lyons takes issue with the fact that the Social Security Administration's "Calculator" specifically notes that its estimates "do not take into account a wide number of factors such as current health, lifestyle, and family history." DN 73, p. 8.[3]  It also challenges an uncertainty on which Wallner's calculation relies: that Social Security will remain solvent through 2037, when Wallner would reach eighty-seven (87).  In response to the latter point, Wallner notes an article listed on the Social Security Administration's website that predicts that benefits will, in fact, be payable in full beyond 2037. *See* Stephen C. Goss, *The Future Financial Status of the Social Security Program*, Social Security Bulletin, Vol. 70, No. 3., p. 1 (2010), *available at* http://www.ssa.gov/policy/docs/ssb/v70n3/v70n3p111.html.

---

[3] We note that Hilliard Lyons refers to the "Calculator" as "rank hearsay" without further elaboration.  We disregard this argument as conjecture. *See* Fed. R. Civ. P. 56.

Having considered the parties' arguments at great length, we will allow Wallner to move forth on her front-pay allegations.  Uncertainty and speculation are an inherent part of front pay damages and will always be present to some degree. *Ardingo v. Local 951, United Food And Commercial Workers Union*, 333 F. App'x 929, 943 (6th Cir. 2009); *Anton v. SBC Global Servs., Inc.*, No. CIV A 01-40098, 2006 WL 2827421, at *9 (E.D. Mich. Sept. 29, 2006) *objections overruled*, No. CIV. 01-40098, 2007 WL 1500171 (E.D. Mich. May 22, 2007).  Yet, what is nearly certain is that Wallner will continue to suffer losses on her Social Security benefits – it is really just a matter of how long.[4]  Wallner has put forth evidence that a jury can use to approximate how long, and Hilliard Lyons is welcome to rebut it as it sees fit.  We believe that an award of front pay would be appropriate in this case to "supplement back pay for the continuing future effects of [retaliation and] to make the victim whole." *Bordeau v. Saginaw Control & Eng'g, Inc.*, 446 F. Supp. 2d 766, 771 (E.D. Mich. 2006) (citing *Mallinson–Montague v. Pocrnick*, 224 F.3d 1224, 1237 (10th Cir.2000)); *see also Wilson v. Int'l Bro. of Teamsters*, 83 F.3d 747, 756–57 (6th Cir. 1996).  Thus, in a word, the Court will allow Wallner to submit evidence of her life expectancy that, along with her undisputed $271 per-month diminution and the relevant discount tables, will allow a jury to reasonably calculate a front pay award. *See Shore v. Fed. Exp. Corp.*, 777 F.2d 1155, 1160 (6th Cir. 1985).

### b.  401(k) Contributions and Returns

Hilliard Lyons' next challenge is to Wallner's calculation and evidence of her lost 401(k) benefits.  Should Wallner prevail at trial, the parties agree that her 401(k) benefit losses can be broken down into two (2) categories: 1). *contributions* that Hilliard Lyons would have made to her 401(k) plan had it not wrongfully terminated her, and 2). *returns* on her plan that she would

---

[4] This situation is easily distinguished from that in *Arban*, where the plaintiff's expert alleged a front pay award that was based on nothing more than the plaintiff's conjecture. 345 F.3d at 406.

have received.  Still, they disagree that Wallner has presented enough evidence for a jury to calculate these losses with any certainty.

Regarding 401(k) contributions, it is undisputed that, up until 2009, Hilliard Lyons contributed to its employees' 401(k) plans in three (3) ways: 1). a non-discretionary base contribution equal to 1% of that employee's salary; 2). a discretionary match based on company profitability; and, 3). a discretionary profit-sharing contribution. DN 71-1, p. 12.  Hilliard Lyons admits the 1% non-discretionary base.  It also admits that it contributed anywhere from $782.79 to $1,831.02 to Wallner's 401(k) during her employment from 2003 to 2009; but it argues that, given that the profitability-based match fluctuated greatly from year to year, there is insufficient evidence in the record to calculate what discretionary contributions it would have made to her 401(k) during her period of discharge.  We disagree.

"The rule is that once the existence of damage is shown with reasonable certainty, difficulty in calculating the amount with mathematical precision will not defeat recovery." *Blackwell v. Sun Elec. Corp*., 696 F.2d 1176, 1192 (6th Cir. 1983) (citation omitted).  Here, there is enough record evidence for a jury to determine how much Wallner lost in non-discretionary and discretionary 401(k) contributions.  Not only does Hilliard Lyons admit contributing amounts ranging from $782.79 to $1,831.02 per year to her plan from 2003 to 2009, Wallner has put forth evidence showing that, during her approximately 26.375 years of 401(k) participation, Hilliard Lyons contributed an average of $637.51 per year to her plan.  Hilliard Lyons does not challenge this figure.[5]  Assuming Hilliard Lyons' contributions increased over time with Wallner's salary increases, the $637.51 average is consistent with the $782.79-$1,831.02 figures put forth by Hilliard Lyons itself.  Absent a contrary showing, $637.51 per year would appear to

---

[5] It does challenge Wallner's math to the extent that Wallner curiously suggest that Hilliard Lyons' yearly 401(k) contributions equaled roughly 10% of her yearly salary.  *See* DN 72, p. 10. We agree that the 10% estimate has no basis in the record.  An average of $637.51 per year would come out closer to 1% of her yearly salary.

be the minimum that Wallner would be entitled to recover for lost contributions.  Therefore, a factfinder could easily look at Hilliard Lyons' average contribution, deduct the undisputed 1% non-discretionary contribution, and come up with a figure to represent Wallner's lost discretionary contributions.  None of this requires a prohibited level of speculation.

To be clear, we reject Hilliard Lyons' arguments that whether Wallner would have received discretionary contributions is too speculative.  The Court will not allow Hilliard Lyons to hide behind the paradoxical implication that Wallner must prove what *discretionary* contributions she would have received *with certainty* – especially where there is no evidence in the record showing that it ever declined to provide all discretionary contributions during a given year.  On the issue of inherently uncertain damages in the employment-discrimination context, the Sixth Circuit has said the following:

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. *Eastman Kodak Co. v. Southern Photo Co.*, 273 U.S. 359, 379, (47 S.Ct. 400, 71 L.Ed. 684).

*Meadows v. Ford Motor Co.*, 510 F.2d 939, 943 (6th Cir. 1975).  Assuming that a wrongdoing is found, we agree that "the risk of the uncertainty" in calculating an exact dollar amount of Wallner's 401(k) losses should be placed upon Hilliard Lyons in this case. *Id*.  We will permit Wallner to put on evidence of her lost 401(k) contributions.  However, Hilliard Lyons *is* entitled to prove that its discretionary profit-sharing contributions ended in 2009, as explained in the affidavit of Dana Estes, Hilliard Lyon's Human Resources Manager who was responsible for

employee benefit plans at the time of Wallner's discharge.[6]   Consequently, there exist genuine issues of fact as to how much Wallner lost in 401(k) contributions that should be decided by a jury.  We will deny Hilliard Lyons' motion to that extent.

Turning to lost returns on Wallner's 401(k), however, we find that Wallner is precluded from receiving any potential losses beyond the rate of return for Hilliard Lyon's Profit-Sharing Plan from 2009 to 2011.  These rates were 4.37% in 2009, 6.99% in 2010, and 6.80% in 2011. Wallner has not responded to Hilliard Lyons' argument on that point, although she claimed an 11% rate of return in her Rule 26 Supplemental Disclosure. DN 72-2.  We reject Wallner's proposed rate as conjecture.  *See Arban*, 345 F.3d at 406.  Should the jury find that Wallner's damages include 401(k) losses in 2012, moreover, Wallner should be limited to those rates experienced by Hilliard Lyon's Profit-Sharing Plan in that year.  We will grant Hilliard Lyons' motion on this narrow issue.

### C.  Right to Offset

Hilliard Lyons' final contention is that it should be entitled to deduct – or "offset" – two sources of payment from Wallner's backpay award.  These two sources are the unemployment insurance benefits *and* Social Security benefits Wallner received after she was discharged and until she either failed to mitigate or would have retired.  Wallner argues, on the contrary, that because unemployment insurance benefits and Social Security benefits are collateral source payments, there is no basis for such an offset.  We address these relatively unexplored issues below.

---

[6] Wallner has asked the Court to use its Rule 37 sanctioning power to strike Estes's affidavit from the record because she was not listed on Hilliard Lyons' witness disclosure sheet.  *See* Fed. R. Civ. P. 26(a)(1)(C); Fed. R. Civ. P. 37(c)(1).  But like in *Phat's Bar & Grill, Inc. v. Louisville-Jefferson Cnty. Metro Gov't*, we believe that Wallner's having been well aware of Estes involvement in the case from its onset outweighs Hilliard Lyons failure to disclose their intention to use her, assuming it had one. No. 3:10-CV-00491-H, 2013 WL 142481, at *2 (W.D. Ky. Jan. 11, 2013). Estes was mentioned at least nineteen (19) times during depositions. DN 41-11; DN 50-4; DN 50-5.  What is more, Estes's testimony is only relevant to the issue of damages, so it is less than clear that Hilliard Lyons ever intended to use her until faced with remand and an impending trial.

We begin with Wallner's unemployment insurance benefits. In framing our analysis, Hilliard Lyons is correct that we should consult relevant Kentucky law in determining whether the collateral source rule is applicable. *See Lindon v. Kakavand*, No. CIV.A. 5:13-26-DCR, 2014 WL 6473621, at *3 (E.D. Ky. Nov. 18, 2014) (citing *Jackson v. City of Cookeville*, 31 F.3d 1354, 1359 (6th Cir.1994)). Thus, Hilliard Lyons points the Court to the following provision in Kentucky's Unemployment Compensation statute:

> Any person who has received any sum as benefits under this chapter . . . [and] has received benefits in weeks for which he later receives a back pay award, shall, *in the discretion of the secretary*, either have such sum deducted from any future benefits payable to him under this chapter or repay the Office of Employment and Training, Department of Workforce Investment, for the fund a sum equal to the amount so received by him.

Ky. Rev. Stat. Ann. § 341.415(1)(a). Here, if the jury ultimately awards backpay to Wallner, this statute is inarguably applicable to the weeks during which she also received unemployment benefits under that chapter. *See Simpson Cnty. Steeplechase Ass'n, Inc. v. Roberts*, 898 S.W.2d 523, 528 (Ky. Ct. App. 1995), *as modified* (May 5, 1995). However, it is also clear that the statute leaves "the matter within the secretary of the unemployment commission's discretion." *Id.* Hence, while it *may* be appropriate for a trial court to instruct its jury to deduct unemployment benefits from its award of back pay, the only relevant authorities say that a trial court *may* enact such an offset; nothing suggests that this is the secretary's preference, let alone that we must do so. *See id*. In fact, the secretary may well prefer to have that person repay the Office of Employment and Training, Department of Workforce Investment instead of allowing an offset to benefit the specific employer that wronged that person.[7] We will decline Hilliard Lyons' invitation to offset Wallner's back pay award under this statute.

---

[7] *See* Eric Pearson, *Collateral Benefits and Front Pay: A Rule of No Offset Encourages Agency Recoupment*, 69 U. Chi. L. Rev. 1957 (2002) (advocating for a "no offset" rule to allow agencies to recoup payments in part because they can ensure the proper distribution of resources, not the employers that were found liable).

Having set aside Ky. Rev. Stat. Ann. § 341.415, we conclude that an offset of unemployment benefits is also inappropriate here under this Circuit's collateral-source jurisprudence. In *Thurman v. Yellow Freight Systems, Inc.*, the Sixth Circuit held that unemployment benefits are collateral source benefits in the context of Title VII discrimination action. 90 F.3d 1160, 1171 (6th Cir. 1996), *opinion amended on denial of reh'g*, 97 F.3d 833 (6th Cir. 1996). It reasoned that "unemployment compensation is not paid to discharge a liability of the employer[,] it is paid to carry out the social policies of the state," thus refuting the argument that employers ought to be able to offset such payments merely because they helped fund them. *Id*. It has employed similar reasoning in applying the collateral source rule to workers compensation and pension benefits in the employment-discrimination context. *See Hamlin v. Charter Twp. of Flint*, 165 F.3d 426, 433 (6th Cir.1999); *Knafel v. Pepsi–Cola Bottlers, Inc.*, 899 F.2d 1473, 1480 (6th Cir.1990); *Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614, 627 (6th Cir.1983). Accordingly, like our sister court – the only court within the Sixth Circuit to address unemployment compensation in the FMLA context – we find that "the reasoning in [the Sixth Circuit's] civil rights and disability cases applies with equal force" here. *Pellow v. Daimler Chrysler Servs. N. Am.*, LLC, No. 05-73815, 2006 WL 2540947, at *11 (E.D. Mich. Aug. 31, 2006). To borrow a quote, because "the Sixth Circuit has strongly endorsed the collateral source rule in general . . . this Court sees no reason why it should not apply" with regards to the FMLA and unemployment compensation. *Id*.

Bolstering this position is the following language from the Supreme Court's decision in *N.L.R.B. v. Gullett Gin Co.*:

> Payments of unemployment compensation were not made to the employees by respondent but by the state out of state funds derived from taxation. True, these taxes were paid by employers, and thus to some extent respondent helped to create the fund. However, the payments to the employees were not made to

discharge any liability or obligation of respondent, but to carry out a policy of social betterment for the benefit of the entire state. *See Dart's La.Gen.Stat.*, 1939, s 4434.1, Act No. 97 of 1936, s 1, *as amended by* Act No. 164 of 1938, s 2; *In re Cassaretakis*, 289 N.Y. 119, 126, 44 N.E.2d 391, 394—395, *affirmed sub nom. Standard Dredging Co. v. Murphy*, 319 U.S. 306, 63 S.Ct. 1067, 87 L.Ed. 1416; *Unemployment Compensation Commission v. Collins*, 182 Va. 426, 438, 29 S.E.2d 388, 393. We think these facts plainly show the benefits to be collateral.

340 U.S. 361, 364-65, 71 S. Ct. 337, 340, 95 L. Ed. 337 (1951).  We resultantly conclude that Hilliard Lyons' is prohibited from offsetting Wallner's unemployment compensation benefits under the collateral source rule.

A more nuanced question is whether the collateral source rule applies to Social Security benefits in the FMLA context.  No court within this Circuit has squarely addressed it.  Yet, comment (C) of the Restatement (Second) of Torts § 920A (1979) states that "Social security benefits, welfare payments, pensions under special retirement acts, all are subject to the collateral-source rule."  Furthermore, six (6) of our sister circuits have found that Social Security benefits are collateral source payments in numerous contexts. *Salitros v. Chrysler Corp.*, 306 F.3d 562, 573 (8th Cir. 2002); *Swanks v. Washington Metro. Area Transit Auth.*, 116 F.3d 582, 587 (D.C. Cir. 1997); *Dominguez v. Tom James Co.*, 113 F.3d 1188, 1191 (11th Cir. 1997); *Green v. Denver & Rio Grande W. R. Co.*, 59 F.3d 1029, 1033 (10th Cir. 1995); *Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251, 258 (2d Cir. 1991); *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 793-95 (3d Cir. 1985).  And because we found that unemployment benefits are collateral in the present case, *supra* p. 17, we are particularly persuaded by the following passage from the Third Circuit's opinion:

There are *no significant discernible differences* between Social Security benefits, unemployment benefits and pension benefits *for this purpose*. All would ordinarily be received by an employee, such as Maxfield, only after s/he has been discharged or involuntarily retired. . . . [W]e see no reason why the benefit of the collateral funds should shift to the defendant. The quotation relied upon in *McDowell* is equally applicable here:

> Since no consideration has been given or should be given to collateral losses in framing an order to reimburse employees for their lost earnings, manifestly no consideration need be given to collateral benefits which employees may have received.

*NLRB v. Gullett Gin Co.*, 340 U.S. at 364, 71 S.Ct. at 339 (emphasis in original) *quoted in McDowell*, 740 F.2d at 217–18 (footnote omitted). As between the employer, whose action caused the discharge, and the employee, who may have experienced other noncompensable losses, it is fitting that the burden be placed on the employer. Moreover, permitting a deduction of Social Security benefits could effectively eliminate the benefit of the ADEA to employees in the 65 to 70 age group, since all would presumably be entitled to Social Security benefits. Such an effect would be inconsistent with the congressional purposes in extending the ADEA to that age group. 29 U.S.C. § 631(a) (1982) (amending 29 U.S.C. § 631(a) (1976) to increase maximum age to 70).

*Maxfield v. Sinclair Int'l*, 766 F.2d 788, 794-95 (3d Cir. 1985). We agree with the Third Circuit's reasoning. Hilliard Lyons should not be able to "avoid[ significant] liability and experienc[e] a windfall" merely because it terminated an employee who was nearing retirement and had the ability to draw on her Social Security. *Hamlin*, 165 F.3d at 434. Further, we agree that there is no discernible difference between Social Security, unemployment, and pension benefits in this context.

In fact, we think, given the similarities between pension and Social Security payments, this Circuit's approach to determining whether pension benefits should be offset is telling. Just like pensions, Social Security benefits involve payments by employers and employees, do not involve a "voluntary undertaking by the employer" to indemnify itself against possible legal liabilities, "vest . . . when one has earned the requisite amount of credits and has reached the requisite age," *Milby v. United States*, No. CIV.A. 08-650-JBC, 2011 WL 3706635, at *3 (W.D. Ky. Aug. 24, 2011) (citing 42 U.S.C. § 402(a)), and provide beneficiaries with payments after they have "spen[t] productive years contributing." *Id.* (citing *Flemming v. Nestor*, 363 U.S. 603, 610 (1960)). There is hardly more comparable scheme in this context. And in *Hamlin*, the Sixth Circuit laid out five factors to be used in determining whether pension payments are collateral:

> (1) whether the employee makes any contribution to funding of the disability payment; (2) whether the benefit plan arises as the result of a collective bargaining agreement; (3) whether the plan and payments thereunder cover both work-related and nonwork-related injuries; (4) whether payments from the plan are contingent upon length of service of the employee; and (5) whether the plan contains any specific language contemplating a set-off of benefits received under the plan against a judgment received in a tort action.

165 F.3d at 434.  When applied to Social Security benefits, these factors weigh against offsetting the payments against a back pay award:  1). Wallner contributed to Social Security; 2). Social Security is mandated by federal law; 3). Social Security covers work-related and non-work-related injuries; 4). Social Security payments are contingent upon age and length of service; and, 5). the Social Security Act does not require an offset against judgment.  This makes sense when one considers that these five factors, as originally explained, were created to help courts distinguish between fringe benefits and "payments made by the employer in order to indemnify itself against liability" – the former being collateral, the latter not. *Phillips v. W. Co. of N. Am.*, 953 F.2d 923, 932 (5th Cir. 1992).  There is no question that Hilliard Lyons' payments to Social Security in no way resembled "payments made by the employer in order to indemnify itself against liability."

Therefore, the Court concludes that any unemployment insurance or Social Security benefits that Wallner has received or will receive are collateral source payments.  Consequently, Hilliard Lyons is not entitled to offset these benefits against any back pay award that Wallner may become entitled to receive.  We will deny this portion of Hilliard Lyons' motion for these reasons.

## IV.

Wallner has filed a motion for leave to file a sur-reply to Hilliard Lyon's reply to her response to Hilliard Lyon's motion for partial summary judgment.  In her sur-reply, Wallner

seeks to address Hilliard Lyon's arguments related to the collateral source rule and Wallner's testimony regarding her annual income and raises.  Because we will deny Hilliard Lyon's motion for partial summary judgment on all arguments related to these issues, however, Wallner's proffered sur-reply would not further Wallner's position and will be denied as moot.

## V.

For the reasons set forth herein, we will grant Defendant's motion for summary judgment only to the extent it requests an order establishing that Wallner is precluded from seeking damages for lost 401(k) returns beyond the rates-of-return reflected in Hilliard Lyons' Profit-Sharing Plan and lost bonuses, and deny the rest. DN 71.  As a result, Wallner's motion for leave to file a sur-reply will be denied as moot. DN 74.  A separate order and judgment will be entered this date in accordance with this Memorandum Opinion.

April 29, 2015

**Charles R. Simpson III, Senior Judge**
**United States District Court**